# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>FOUR CELLULAR TELEPHONES CURRENTLY<br>LOCATED IN EVIDENCE AT THE GREENSBORO<br>POLICE DEPARTMENT | )<br>)<br>)<br>)<br>)<br>)    Case No. 1:22MJ 151 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1962(d) | Racketeer Influenced and Corrupt Organization (RICO) Conspiracy |
| 21 U.S.C. § 841(a)(1)/846 | Narcotics Conspiracy |

The application is based on these facts:

See affidavit in support of search warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Nicholas L. Combs
*Applicant's signature*

Nicholas L. Combs, FBI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 03/29/22

*Judge's signature*

City and state: Greensboro, North Carolina

L. Patrick Auld, United States Magistrate
*Printed name and title*

# ATTACHMENT A

The property to be searched are the following Devices, which are currently stored in GPD Evidence at 300 South Swing Road, Greensboro, North Carolina:

- A black Samsung H20 cellphone, IMEI #353495111192816, IMEI3534611112814;

- A black Apple iPhone (256gb) with two small camera lenses on the back;

- A blue Apple iPhone with two larger camera lenses on the back; and

- A beige Apple iPhone with one camera lens on the back.

This warrant authorizes the forensic examination of the Subject Devices for the purpose of identifying the electronically stored information described in Attachment B.

1

## ATTACHMENT B

1.    All records on the Subject Devices described in Attachment A that relate to violations of 18 U.S.C. § 1959, Attempted Murder in Aid of Racketeering; 18 U.S.C. § 1962(d), Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy; 21 U.S.C. § 841(a), Drug Trafficking; 21 U.S.C. § 846, Drug Trafficking Conspiracy; and the existence, membership, continuity, racketeering activity, structure, scope, and operations of the QN/QMG criminal enterprise; and involve Darius King, in the form of the following:

   a.   list of contacts and related identifying information, such as telephone numbers, addresses, email addresses for QN/QMG gang members and associates;

   b.   incoming and outgoing communications, including, but not limited to calls, SMS messages, MMS messages, and any third-party application communications that show communications between QN/QMG members and associates;

   c.   photos, videos, or other images taken or saved to the Devices as showing QN/QMG gang members and associates together and association-in-fact among QN/QMG gang members and associates;

   d.   any and all information associated with applications downloaded to the Devices that shows narcotics trafficking, payments, or proceeds or applications that facilitate interaction between QN/QMG gang members and associates;

   e.   all bank records, checks, credit card bills, account information, and other financial records or third-party transaction information maintained on the Devices that

1

shows narcotics transactions or payments by QN/QMG members and associates;

f.   location information, to include GPS coordinates, IP address information, or addresses put in any map applications that are scenes of violence or narcotics transactions perpetrated by King and members and associates of the QN/QMG enterprise;

g.   cookies, internet sessions, and internet browsing histories that show firearms, narcotics, and QN/QMG publicity or association among QN/QMG gang members and associates;

h.   notes or other electronic forms of ledgers that show narcotics, narcotics proceeds, and QN/QMG gang member's and associates' distribution of such drugs;

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted

2

by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FOUR CELLULAR TELEPHONES CURRENTLY LOCATED IN EVIDENCE AT THE GREENSBORO POLICE DEPARTMENT, 300 S. SWING ROAD, GREENSBORO, NORTH CAROLINA | Case No. 22:MJ _151_ |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Nicholas L. Combs, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—four electronic devices, further described in Attachment A—which are currently in law enforcement possession, and the extraction from these devices of electronically stored information described in Attachment B.

2.      I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have held this position for over 14 years. I am also a Police Officer III with the Greensboro Police Department (GPD) and I have been employed by that agency for over 20 years. As an FBI TFO, I am currently assigned to the Charlotte Division, Greensboro Resident Agency Office of the FBI's Safe Streets Task Force. In this capacity, I am authorized to investigate matters involving violations of federal law, which generally includes violations involving firearms, narcotics, violent crime, and coordinated gang activity. I hold an Advance Law Enforcement Certificate issued by the North Carolina Criminal Justice Training and Education Standards Commission. I have completed

assignment as a patrol officer, a community resource officer and I was also previously part of the GPD gang unit. I have been a sworn law enforcement officer for over 20 years with over 8 years continuous assignment in the Criminal Investigations Division at GPD. I have over 1100 hours of training that includes, but is not limited to, search warrant drafting, highway drug interdiction, interview and interrogation, police law institute, and tactical surveillance and investigative principles. I have made multiple felony and misdemeanor arrests for controlled substance violations during my tenure as a police officer and as an FBI TFO. Through instruction, training, experience, participation in investigations, and the exchange of information with other law enforcement, I am familiar with the manner in which people commit violent crimes and the methods, language, and terms that are used to further their criminal activities.

  3.  As an FBI TFO, I have conducted investigations into violent crimes such as bank robberies, kidnappings, and firearm possession/use, among other investigations. As part of these investigations, I have conducted and participated in consensual monitoring and physical surveillance, the execution of search warrants, and debriefings of cooperating sources and witnesses. For the last several years I have been investigating, almost exclusively, criminal gang activity in the greater Greensboro area and elsewhere. And, this recent investigative activity has focused primarily on United Blood Nation, Nine-Trey Gangsters, Quixk Nation/Quixk Money Gang (QN/QMG), and their rivals. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of, and

2

to make arrests for, offenses against the United States enumerated in, but not limited to, Title 18 and Title 21 of the United States Code.

4.    I have also participated in multiple investigations wherein criminal organizations establish control through violence and threats of violence. Through my training and experience, I am aware that members and associates of criminal organizations, especially within QN/QMG specifically, enrich the members and associates of the organization through, among other things, murder, robbery, and the distribution of controlled substances. I also have become familiar with criminal organizations preserving and protecting the power, territory, and profits of the organization through the use of intimidation, violence, threats of violence, assaults, and murders.

5.    The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this long-term investigation. I have set forth facts that I believe are sufficient to obtain a search warrant for the following cellular phone devices (hereinafter the "Devices"):

- A black Samsung H20 cellphone, IMEI #353495111192816;

- A black Apple iPhone (256gb) with two small camera lenses on the back;


- A blue Apple iPhone with two larger camera lenses on the back; and

3

- A beige Apple iPhone with one camera lens on the back.

6.      Through these investigations, I have become familiar with the manner in which criminal organizations, including QN/QMG, execute violent acts and distribute narcotics in furtherance of their racketeering enterprise, with the use of cellular telephones. As explained in further detail below, Darius Rayshaun King, a.k.a. Ditto, specifically uses cellular telephones to perpetuate his standing as the "High" in the gang and to coordinate and to facilitate QN/QMG gang activities.

7.      Pursuant to 18 U.S.C. § 1961, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" and "racketeering activity" includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance," which is chargeable as a felony under State law.

8.      Based on the investigation to date, including the evidence summarized in this affidavit, investigators have identified various individuals as members and associates of the QN/QMG organization, including the individuals listed below.  There is probable cause to believe that the Devices contain evidence relating to 18 U.S.C. § 1959(a)(5) Attempted Murder in Aid of Racketeering; 18 U.S.C. § 1962(d) Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy; 21 U.S.C. § 841(a) Drug Trafficking; 21 U.S.C. § 846 Drug Trafficking Conspiracy; and evidence pertaining to the existence, membership, continuity, racketeering activity, structure, scope, and operations of the QN/QMG criminal enterprise.

4

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

9.     The property to be searched are four cellular telephones previously described above and in Attachment A. The Devices are currently being in evidence at the Greensboro Police Department, 300 S. Swing Road, Greensboro, NC. The Devices were obtained from a 2013 Red Cooper Mini, driven by Darius Rayshaun King, a.k.a. Ditto, when he was arrested on a federal arrest warrant.

10.     This warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## FACTS SUPPORTING PROBABLE CAUSE

### Background of the QN/QMG Enterprise

11.     Based on accounts by cooperating sources and defendants, conversations with other law enforcement officers, and review of historical police reports, social media accounts, and the FBI's investigation in this case, I have learned the following about QN/QMG, including their means and methods:

12.     The FBI SSTF has been engaged in a long-term investigation of a United Blood Nation, Nine Trey Gangsters (NTG) since approximately 2016.  The local band of NTG self-identifies as the "Quixk Line" or "Quixk Nation" or "Quixk Money Gang" or "QMG," among other similarly worded monikers.  As with other national NTG sets, members of the local NTG/QMG set frequently use a variety of unique terms to identify themselves.  These include, but are not limited to, "Nine Trey," "93," "Trey Homie," "Billy," "Billies," "Billy Bad Asses," "BBA," "Bully," "Bullies," and assorted variations

5

thereof. NTG/QMG gang members in Greensboro, High Point and in the surrounding area, over time, have committed a variety of federal and state offenses, including, but not limited to, aggravated assaults, shootings, robberies, burglaries, distribution of narcotics (marihuana, MDMA, cocaine, and heroin), and unlawfully possessed firearms. Since the beginning of the investigation, it has yielded successful prosecutions of various individuals in Middle District of North Carolina, mainly for felon in possession and narcotics-related offenses. More recently, a federal grand jury returned an indictment under case number 1:22CR75 charging King along with eleven other individuals with violations of Title 18, United States Code, Section 1962(d) (RICO Conspiracy), and Title 21, United States Code, Sections 841(a) and 846 (distribution and conspiracy to distribute narcotics), among other crimes, the basic facts of which are referenced below.

13.     The QN/QMG enterprise has a distinctive hierarchy and rank structure. During the course of the investigation the FBI, with assistance from other law enforcement agencies, has identified over one hundred QN/QMG gang members and associates that are based primarily in Greensboro and High Point. With sheer numbers, and ready access to firearms, QN/QMG gang members are quick to shoot and assault rivals either to settle personal disputes or enforce the will of the larger enterprise.

14.     QN/QMG operates as a criminal enterprise involved in drug trafficking, violent assaults, murder, and other racketeering activities. At the top is King, the QN/QMG "High," who gained power and status due to the money he brought in from his successful drug trafficking efforts and a history of currying favor with the Nine-Trey Gangsters leadership in the Southeast and in New York. As alleged in the Indictment,

6

visitation records obtained from the New York State Department of Corrections show that a person named "Darius King" visited the highest ranking Nine-Trey Gangster, Godfather Pedro Gutierrez, a.k.a. Magoo, a.k.a. Light, at Wende Correctional Facility on or about March 1, 2017. Days later, on or about March 7, 2017, King was involved in a Facebook exchange in which he delivered the following photo to QN/QMG members and associates with a caption reading "[t]his magoo this was last week tell them get they moral right or get kleaned up:"



Through this and other evidence, there has never a question about who sits at the top of the QN/QMG enterprise. King has almost unilateral authority to give members and associates rank, provide them with narcotics, and can authorize or condone violent racketeering activity.

15. The top of QN/QMG leadership otherwise includes virtually every other person charged in the Indictment, including Saquan Rouse a.k.a. SQ and Jackii Floyd a.k.a. Boss, as will be further detailed below. These men can give orders to lower ranking members regarding drug trafficking and violence, and in fact perform that violence on their own when necessary. In addition to gang leadership, another role is "shooters." These individuals are responsible for using violence or threats of violence against rival gangs and protecting the gang's street credibility. "Shooters" help ensure that the gang maintains its reputation through exercise of power and intimidation. According to the investigation, the thousands of documents compiled and the hundreds of interviews with confidential sources, victims, and civilian witnesses, QN/QMG engages in violence to ensure that the gang maintains its reputation. And, not only that, but King is made aware of such violence through the use and communication through cellular telephones as detailed below.

## Summary of Indicted Overt Acts that Involve Kings Use of Cellular Telephones to Advance the Purposes and Goals of the QN/QMG Enterprise and Reflect Racketeering Activity

16. The investigation has revealed QN/QMG's involvement, since around 2012 and continuing to the present, in numerous murders, attempted murders, narcotics distribution, and other crimes. Cooperating sources, interviews, social media returns from search warrants, car rental records, flight records, bank records, analysis of telephone toll and cell site location records, physical and video surveillance, and other investigative steps, establish that QN/QMG gang members commit violent acts and other violations of

8

state and federal law at the direction of, and with the support of, King and other QN/QMG leadership.

17. The FBI has interviewed numerous individuals, including victims, cooperating witnesses associated with QN/QMG (some of whom have already pleaded guilty to Racketeering Activity and other crimes), and witnesses to the criminal activities of QN/QMG. A sampling of offenses where King used a cell phone to facilitate drug business or narcotics activity is described in greater detail below.

*3/22/22 Arrest of King and Seizure of the Devices*

18. The Devices are currently in the possession of the Greensboro Police Department pursuant to the arrest of King during a traffic stop of his 2013 Red Mini Cooper and the related GPD inventory search policy.[1] The inventory seizure included only valuable items—the aforementioned four cellular phones, an iPad tablet, a digital Cannon camera and Cannon lens, a Luis Vuitton bookbag, approximately $4500 in United States Currency, and assorted personal items that included debit cards and hotel keys.

19. On or about March 21, 2022, in the Middle District of North Carolina, King was charged by a then-Sealed Indictment in case number 1:22CR75-1 with violations of Title 18, United States Code, Section 1962(d) (RICO Conspiracy), and Title 21, United States Code, Sections 841(a) and 846 (distribution and conspiracy to distribute narcotics). A related arrest warrant was issued on the morning of March 22, 2022.

20. Prior to the receiving the federal arrest warrant, FBI TFO Keith Springs made efforts to locate King in order to effect his arrest, along with the others charged in the Sealed Indictment. On the morning of March 22, 2022, TFO Springs located a 2013 Red Cooper Mini at a residence off of Pisgah Church Road that had been previously associated with King. TFO Springs and other GPD units then made efforts to conduct surveillance and identify King in order to arrest him at some point later in time.

21. At approximately 12:30 pm, TFO Springs and others observed King exit the Village Lofts, an upscale apartment complex off of Pisgah Church Road. King was carrying three bags. He placed a pink bag on the hood of the Red Cooper Mini and placed two black bags inside the Red Cooper Mini. King got into the car and drove around the building with the pink bag on top of the hood of the Red Cooper Mini. No surveillance units saw what happened with the pink bag on the hood of the car, but afterward surveillance units picked up King exiting the Harris Teeter Parking lot on Pisgah Church

---

[1]

Prior to the inventory seizure, the FBI applied for a search warrant for all of the items inside the 2013 Red Cooper Mini that this Court did not sign. The inventory of the car was completed after consultation with GPD and the United States Attorney's Office.

9

Road. The Village Lofts are situated directly behind the Harris Teeter. King continued going south on Elm Street until he reached Wittington Street and made a right turn into a Valero Gas Station. King did not get out of the car.

22.     King pulled out of the parking lot of the gas station on Whittington Street and made a left onto Ashe Street. King proceeded to South Street and a left on to Lama Street where surveillance units briefly lost car. The Red Cooper Mini reappeared at the Biscuitville on Randleman Road. After the Red Cooper Mini left Biscuitville, GPD patrol cars stopped the car after it made a left turn from Randleman Road onto Garrett Street. At the time of the stop, King did not have a valid driver's license.

23.     A GPD patrol officer approached the Red Cooper Mini briefly and walked back to the patrol car. Two other GPD cars boxed in the Red Cooper Mini and advised King that there was a warrant for his arrest.

24.     Upon approaching the car, other officers arrived, and could see in plain view bulk cash sitting in the pocket of a backpack in the front passenger seat.

25.     The second black carry-on bag was situated on the emergency break between the front passenger seat and the driver's seat. The top zipper on the carry-on was slightly open revealing what appeared to be another quantity of bulk cash.

26.     Officers also observed four cell phones in the car: a phone with a green case on the driver's seat, two phones in the front passenger seat, near the two black bags containing a then-undetermined about of cash, and one cell phone on the dashboard: the Devices are described above and in Attachment A. According to the information contained in the Indictment, as recounted in the summary of incidents below, King regularly has available and receives large amounts of United States Currency to facilitate his drug trafficking business. During the booking process, post-arrest on the federal warrant, King maintained that he had employment as a music producer. Through the course of this investigation your affiant learned that King is the registered agent of Quickz Musik Group, L.L.C., a local music promotional group. However, in a seizure that occurred in January 2018, investigators seized a notebook that contained writings referring to Quickz Musik Group, L.L.C., in relation to the application for that business to be registered with the North Carolina Secretary of State, along with an accounting of what appeared to be over $2,000,000 in narcotics transactions that involve QN/QMG gang members, including persons already prosecuted by the United States Attorney's Office and others that are named individuals in the Sealed Indictment. Attached are two photos showing the drug ledger portion of the notebook:

10



In the photo, the accounting depicted on the left in the notebook, found with King's North Carolina identification card in a Luis Vuitton bag, shows the following QN/QMG gang members and associates by their nicknames and the monies the owed to King for narcotics including "Prez," "Tippz" (nickname of indicted co-conspirator Brandon Tipps), "KP," and "Whoo."[2]  I believe these calculations reflect narcotics transactions based on the persons listed by their nicknames, who are known drug and QN/QMG gang associates of King. In addition, at the top of the picture on the left, there are at least two listings, crossed out, that involve a specific weights and narcotics related language. For example, the crossed-out reference to "Tippz" refers specifically to "9ᵒᶻ Shorty." Nine (9) ounces of narcotics roughly equates to a quarter kilogram, and King has been known throughout time to have multiple kilograms of marihuana, heroin,

---

[2]

 "Prez" was prosecuted in MDNC Case No. 19CR152-1 for possessing with the intent to distribute cocaine hydrochloride.  The weight involved 500 or more grams of that substance, a half-kilogram. Tipps is part of the charged § 1962(d) RICO Conspiracy and the 21 U.S.C. § 846 Narcotics Conspiracy in the present 22CR75-1 indictment. "KP" and "Whoo" are uncharged QN/QMG co-conspirators who are historically associated with "Dustbowl." Historically, there are QN/QMG gang members and associates that are also "Andrew Street Boys" or "ASB 500." As told by numerous informants and through examinations of social media, the "Dustbowl" historically refers to geographic area off of Martin Luther King Blvd. in Greensboro. It is QN/QMG narcotics stronghold. Charged RICO co-conspirators Rickey Allen Williams and Robert Lee Townsend are historically from and presently known to frequent that area.

11

fentanyl, and cocaine available at any given time. Another crossed-out line indicates a "2<sup>lbs</sup>" quantity of "smoke" provided to another individual. "Smoke" is a common reference to marihuana.

27.    Following King's arrest on the federal warrant, GPD officers rolled the window up in the Red Cooper Mini and called the tow truck company ordinarily used by the City of Greensboro. GPD officers, supported by an FBI TFO, and later by an FBI Special Agent, followed a tow truck carrying the Red Cooper Mini to Bobby's Friendly Towing and Recovery. The car was under constant surveillance until the valuables were seized pursuant to GPD's inventory search policy and in consultation with the United States Attorney's Office.

<u>King's Use of Cellular Telephones to Advance the Goals of QN/QMG Enterprise and Manage the Affairs of its Members and Associates.</u>

28.    Over time, the evidence gathered from this investigation shows that King uses cellular telephones to run, manage, and lead QN/QMG enterprise. This cellular phone use crosses over to all facets of the gang from violent crime (shootings) to narcotics trafficking. The following is a short recitation of indicted and other events in which King specifically used a cell phone to engage in the charged § 1962(d) conspiracy. A cooperating QN/QMG gang member, (hereinafter "CD-1")[3] who pleaded to a § 1962(d) RICO Conspiracy charge in December 2021, has previously reported that King

---
[3]    During the course of long-term investigation, the investigative team has utilized many confidential sources. The cooperating defendant, CD-1, referred to in this affidavit is cooperating in exchange for possible leniency at the conclusion of the QN/QMG case. The FBI has periodically paid the source and paid off certain drug debts for the source so that the source's identity will remain secret. The source is also represented by counsel and has debriefed with the FBI on numerous occasions. The source had state criminal matters pending that were consumed by his § 1962(d) RICO Conspiracy plea. However, other more recent charges are pending and the source has been told he will receive no assistance from the FBI or MDNC as part of their ultimate disposition. The source and the information provided by the source as proved reliable according to the source's consistent contact with FBI handlers, the information provided, independent investigation conducted by the investigative team, surveillance efforts, controlled recordings, and the consensual monitoring of some of the source's activities. As part of the source's cooperation, the investigative team has resolved, and will continue to resolve, many crimes, both state and federal, that otherwise would never be prosecuted. For the source's safety, it is imperative that the source's identity is, and remains, a closely guarded secret during the pendency of the matter for as long as possible.

12

employs multiple cell phones to contact QN/QMG gang members, facilitate the distribution of narcotics, and conduct the gang business he needs to as the enterprise's leader.[4] Since the Devices were seized, neither King, nor anyone acting on his behalf, has requested that they be returned to King as of the late afternoon of Friday, March 25, 2022.

*August 7, 2019 (Indictment, 22CR75-1 Overt Acts (kkk), (mmm))*
*King Calls CD-1 to Come to a Location Where King Distributes Heroin to CD-1 and Others as*
*"Throw Money" for Birthday Trip to Las Vegas*

29.    On or about August 2, 2019, King sent a cell phone communication to a CD-1 and others to come to a home associated with QN/QMG member Chrishaun Young, a.k.a. Tre-4.  Once there, King provided CD-1 and three other QN/QMG members each with two ounces of heroin. King instructed CD-1, Young, Jeremy Wayne Hasty a.k.a. Seno, and Kassim Ford a.k.a. Fat Pockets (now-deceased), to sell the heroin and return to $6000 to King as "throw money" for the group's anticipated trip to Las Vegas. After a mix up about where CD-1 had placed the heroin given to him/her by King over the weekend, the FBI took custody of the drug evidence on August 5, 2019.  And thereafter, the FBI provided CD-1 with funds to complete a controlled transfer of the money back to King. Through recorded interactions, CD-1 recorded King acknowledging that Young, Hasty, and Kassim Ford had all paid King back the required $6,000 before source did.  On August 7, 2019, CD-1 paid King in full, in another recorded transfer at a home associated with QN/QMG gang member known as "Two Times" or "Toogie."

*September 6, 2019 (Indictment, 22CR75-1, Overt Act (nnn), Counts Six and Seven)*
*King Receives Cellphone Call in the Aftermath of Rouse Shooting at an Individual Rouse*
*believed to Be an "Op"—a Term Used to Describe QN/QMG Rivals*

30.    On or about September 10, 2019, CD-1 called the FBI and informed them about a shooting conducted by Saquan Lanard Rouse, a.k.a. "SQ." CD-1 relayed that on September 9, 2019, CD-1 was playing cards with King and QN/QMG gang member Chrishaun Young, a.k.a. "Tre-4." During the game, King received a call from either "Smush" Brown or "Pookie" Brown. CD-1 advised that "Smush" has a child in common

---

[4]   Below is a short summary of certain events where King's use of cell phones is tied directly to § 1962(d) or narcotics activity. There are many more, but I believe the following are sufficient, in summary fashion, to meet probable cause for the requested warrants.

13

with David Clark, a.k.a. "Prez" and "Pookie" has a child in common with another QN/QMG member, Deon Johnson, a.k.a. "Sonny." According to CD-1's information, "Smush" and "Pookie" had another sister who is not affiliated with 9-Trey that resides in Hairston Homes, located on Marsh Street in Greensboro, NC. The Browns inquired why Saquan Rouse, a.k.a. "SQ" had shot at their sister. King ended the telephone conversation and instructed CD-1 to contact Rouse to investigate the accusation further.

31. Rouse met CD-1 at an undisclosed location on or about September 9, 2019. During the meeting, Rouse provided discrete details of the assault that occurred on September 6, 2019. Rouse believed he had seen and individual named K.C. getting into the front passenger seat of car that was parked in the parking lot of an apartment complex. Rouse followed that car (Tanekia Brown's) car in his light blue Toyota. After Rouse followed Brown's car to confirm that the "op," allegedly K.C., was in the front passenger seat, Rouse passed Brown's car and fired shots into it in an attempt to shoot K.C..

32. CD-1 informed Rouse that alleged rival gang member K.C. was not in the car and that Rouse had misidentified his intended target. Rouse explained that the only reason that he targeted K.C. was based on Rouse's understanding that K.C. had provided an unknown QN/QMG rival the address of QN/QMG gang member M.G. a.k.a. Blaze shortly before M.G. was the target of a shooting on or about July 16, 2019. CD-1 also made clear that the Ugly Line of QN/QMG, for which Rouse was among the highest-ranking, non-incarcerated leaders at the time, had been feuding with members of a rival gang, "Gun Gang," for a period of some years. Relatedly, CD-1 indicated that QN/QMG gang member M.G. was multiple times a target of the Gun Gang's retaliation because M.G. had previously been an "800 Cranbrook" gang member (the predecessor gang to "Gun Gang") before flipping into QN/QMG in approximately 2015. Rouse explained to CD-1 that he intended to lay low and get his car painted.

33. Investigators corroborated much of CD-1's information in this regard by interviewing members of the Brown family. The FBI also obtained surveillance footage from the apartment building where Rouse misidentified an innocent bystander as a rival gang member. Rouse can be seen on that footage. After the shooting on Randleman Road, Rouse turned around his Toyota Camry in a gas station. The car has distinctive rims and a different color on one of its front panels. TFO Springs also tracked down Rouse's car a few days later in a parking lot of apartment complex where Rouse lived at the time. TFO Springs personally observed that the car Rouse had used to commit the shooting had been painted entirely black. The car is also registered to one of Rouse's family members.

*May 16, 2020 & June 16, 2020 (Indictment, 22CR75, Overt Acts (yyy)-(zzz))*
*King Uses Cellphone to Contact CD-1 and Facilitate Bulk Cash Payments*

14

34.     At some point in time between February 2020 and present, King, deceased QN/QMG gang member Keyoka Robinson, a.k.a. Dolla, and others, have provided millions of dollars in cash payments to a drug courier.  On May 16, 2020, an FBI Charlotte Source (CLT Source)[5] drove to Greensboro on behalf of an individual later identified as Seneca Moore, a target of a separate, but related investigation by the FBI in the Western District of North Carolina. The CLT Source was directed to a home in Greensboro that was rented by King's girlfriend, Ashley Muhammad. Even at that time, the home at 5824 Sycamore Glen has previously been the subject of FBI surveillance because of CD-1's information that the address was potentially used to store narcotics or US Currency. The CLT Source's recording equipment clearly captured Robinson's face on camera when Robinson met the CLT Source in the driveway of that home. Thereafter, Robinson loaded cardboard boxes into the CLT Source's car. The CLT Source returned to Charlotte where he/she met the FBI Charlotte's target to transfer the cash to him. Thereafter, the Monroe Police Department received the drug-cuurency drop tip from the FBI and completed a traffic stop based on an obstruction over the white pickup's registration plate. The target of the WDNC investigation was driving the car. After a K-9 alerted to the truck, the police searched Moore's truck and seized the $935,754 in cash. About $800,176 of the seizure was shrink wrapped and marked with a red, five-pointed star, a well-known United Blood Nation (and NTG/QN/QMG) symbol. The following picture reflects a portion of the bulk cash subject to law enforcement seizure.

---

[5]

  The FBI Charlotte source was a "walk-in" informant who began working with FBI agents in the Charlotte, NC area because he/she perceived he/she was doing something illegal. The FBI Charlotte source does not appear to be connected to King or QN/QMG specifically, but rather a paid associate/courier of another target of investigation believed to be moving money for an unspecified Mexican DTO.

15



35.     About a month later, on June 16, 2020, King called CD-1 and told CD-1 to meet King at Epic Soundz Studio off of Swing Road in Greensboro. From there, King directed CD-1 to a Walmart on Cone Boulevard in Greensboro. Surveillance footage obtained by the FBI from Walmart shows King and CD-1 walking into the store and purchasing luggage. King then directed CD-1 to the same housing development where Robinson had provided the May 16 payment to the CLT Source. King directed CD-1 to circle the block twice, and passed 5824 Sycamore Glen. King then directed CD-1 to a house located at 5501 Hardie Farm Drive. CD-1 reported that he/she and King went to back of a garage loaded 7-8 shrink wrapped packages ($700,000-$800,000) of cash into the luggage purchased at Walmart.[6] CD-1 indicated that the packages were marked with a

---

[6] Through time, the source referred to herein who has pleaded guilty to RICO conspiracy charges, along with numerous other sources of information and cooperating defendants, have indicated from personal observation that King is a source of supply for large quantities of narcotics for the QN/QMG enterprise. For example, a knock and talk by the Guildford County Sheriff's Office on or about July 18, 2018, yielded a seizure of 7.4 kilograms of heroin, 2.5 kilograms of fentanyl, a Tyvek suit and respirator, and a kilo press at the home of another cooperating witness. *See* Indictment, 1:22CR75-1, Overt Act (eee). That witness (hereinafter CW-1) debriefed with the FBI shortly after the incident. The seizure corroborates historical observations of how King "cooks" his heroin at other residences, usually ones rented or owned by Ashley Muhammad and other female associates. The CW-1 knew that King kept narcotics in the apartment and cooked them there, mostly when CW-1 was not home. Subpoena returns from Cash App show that a user "dariusking1988$"

16

five-pointed red star, just as they were for the previous bulk-cash delivery in which CD-1 was not involved. King then instructed CD-1 to a travel center on I-40 where they met an unknown Hispanic truck driver driving a light blue 18-wheeler and loaded the luggage onto 18-wheeler. During the drive to the highway-side gas station and convenience store, the source overheard King speaking with someone the phone as they neared the meeting point. King argued that he should not be responsible for loss from the May 2020 money drop and referred to Greensboro being his "ranch"—i.e., King's/QN/QMG's exclusive territory. The source also noted that King had multiple cellphones on him all of which looked the same. After the transaction, CD-1 observed King call someone named "Reno" to advise "Reno" that King had personally handled the money drop. During the same call, King ordered an unspecified amount of the "stinky one," the "cold one," and "the cubes," narcotics CD-1 believed to be coded references to marihuana, meth, and heroin (or cocaine), respectively.

*October 6, 2020 (Indictment 22CR75-1, OA (bbb))*
*Now-Deceased Gang Member Shoots at Rival Crip Gang Member and Calls King\*

36.     On October 16, 2020, Rollin 60's Crip gang member Archilles Clark, a.k.a. Jizzle pulled his 2020 Dodge Charger into car wash stall at New Glo carwash off Randleman Road in Greensboro. Almost immediately after pulling in, a small-framed individual wearing a hoodie unloaded a barrage of gunfire on Clark while his car was being washed. Clark's young daughter, Z.C., (3-year-old) was in the front passenger seat. A witness, who did not want to be identified, stated a small-framed male, approximately 5'6", wearing a dark hoodie approached the stall where Clark had parked and shot into it. GPD officers recovered fifteen .40 caliber shell casings outside the carwash stall. The entire incident is caught on a surveillance camera installed inside the carwash bay.

37.     On the day of the shooting, CD-1 called the FBI. The source stated that he/she had just left Terrance Gernado Coleman's apartment. There, the source overheard

---

periodically made payments into the cooperating witness's account as payment for use of the apartment.
17

a (speaker) phone conversation between now deceased QN/QMG gang member Keyoka Robinson and King. The source relayed that Robinson told King, on speakerphone, that she had just "walked down" on "Jizzle," meaning, Robinson had approached "Jizzle" and shot him at close range. Floyd was also there, and like King, laughing at Robinson for missing her target despite being so close. Robinson was lobbying for credit, respect, and/or acknowledgement for the shooting from King. In essence, King told Robinson that she would not be receiving any credit for a shooting in which she did not hit anyone. Robinson stated she would have killed "Jizzle" if the "FN" had not jammed.

      38.    In an entirely separate investigation, GPD police officers recovered a .40 caliber "FN" manufactured firearm during an attempted car stop in early December 2020. A test-fired cartridge form that weapon matched the spent casings at the scene of the Archilles Clark shooting.

*January – February 2022*
*Threat to CD-1's Safety and King's Three-Way Cell Phone Call with CD-1 and Jackii Floyd*
*a.k.a. Boss*

      39.    The investigative team learned from CD-1 that between on or about January 11, 2022 and January 14, 2022, a previously high-ranking gang associate who is charged in the Indictment as a § 1962(d) co-conspirator, Jhustyn Kelvin Mitchell, a.k.a. J-West, was inquiring inquired about or was otherwise made aware that CD-1 had been in custody. Mitchell is currently serving a 34-month federal sentence in MDNC No. 20CR131-1 based on an 18 U.S.C. § 922(g) (felon in possession) conviction. He is serving the remainder of this time at FCI Beckley.

18

40.     On January 14, 2022, the government served upon the Bureau of Prisons, FCI Beckley, a grand jury subpoena requesting email/text message exchanges and jail phone communications for Mitchell. The government received electronic copies of the requested information via FedEx on the afternoon of January 28, 2021. The communications included sixty-seven recorded jail calls and approximately 700 pages of substantive email/text message content through the Bureau of Prison's TRULINC's software program. Consistent with the government's requests in the subpoena, the communications were dated between approximately December 1, 2021 and January 20, 2022. A cursory search of the TRULINCS content revealed an email/text message communication from Mitchell to an unattributed email address, "Brazy World," taliacapizzi6248@yahoo.com, that states what the investigators interpret to be an unambiguous (but incorrectly spelled) reference to CD-1's middle name.

41.     Further review of the subpoenaed jail calls established that Mitchell engaged in a series of recorded jail calls with at least two women between January 11, 2022 and January 13, 2022. On January 11, 2022, during a jail call that begins at 3:02 p.m., a woman Mitchell identifies as "Liesha" on the phone advises him [the gang associate] that she "heard some sh*t about [CD-1's QN/QMG well-known nickname]." The woman then recounts to Mitchell that she heard that [CD-1's QN/QMG well-known nickname] is in "protective custody" for potentially "snitching." For the next two days, until approximately January 13, 2022 at 3:00 p.m., Mitchell, on separate occasions, calls "Liesha" and another woman identified on the phone by her nickname, "Lex," regarding whether CD-1 is cooperating with police, whether the CD-1 has pending charges, and

19

whether CD-1 is in "protective custody" or in "witness protection." The inquiries appear to end with a jail call recorded on or about January 13, 2022. During that conversation, a woman tells Mitchell that information relayed to her from unknown sources indicates that CD-1 had an "ankle monitor" and was generally avoiding contact with other gang members by staying in Raleigh.

42.     On or about February 14, 2022, two FBI TFOs visited CD-1, where, at the time, CD-1 was being supervised by the MDNC United States Probation Office.[7] CD-1 was given recording equipment to record any interaction with QN/QMG gang members over the phone. The FBI TFOs stayed in the room (hidden in a closet) when CD-1 called Floyd. Floyd picked up a Facetime call. While speaking with Floyd, King called Floyd from a phone number previously unknown to the FBI investigative team. In essence, in two short conversations with King and Floyd that for a brief time occurred during a three-way call, CD-1 told Floyd and King that CD-1 had an ankle monitor and was on house arrest from an incident in Winston-Salem that occurred in October 2021. Because King and Floyd were previously aware of CD-1's outstanding charges in Winston-Salem, they accepted CD-1's reason for being out of touch with the gang, or, briefly in a custodial situation. At the time, Floyd and King accepted CD-1's representations. The sum of this particular incident confirms that CD-1's whereabouts and the issue of potential cooperation was of great importance to the gang enterprise, and King and Floyd specifically. As part of the QN/QMG rules, there is virtually a zero-tolerance policy for members and associates who cooperate with law enforcement.

---

[7] For reasons unrelated to this operation, the source is in now in pre-trial custody.

20

43.     The Devices are currently in storage at the Greensboro Police Department, located at 300 South Swing Road, Greensboro, NC.  In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI/GPD.

**Cellphones Are Tools of the Charged RICO Conspiracy and the Need for Search Warrant**

44.     Based on my training and experience, I know that computers, specifically cellular devices, can contain evidence of criminal enterprise activity. Members of criminal enterprises use phones to communicate with other co-conspirators to advertise drugs and firearms for sale, spread news about murders, shootings, or other violent offenses, as well as to intimidate rivals or those suspected of cooperating with law enforcement. Members of criminal enterprises frequently install social media applications ("apps"), like Instagram or Facebook, on their cell phones so that they can be accessed on the go. They then use these apps to communicate privately with co-conspirators. Individuals use the apps to brag to rival gang members about recent shootings, or to communicate with potential victims to determine their location or to lure them to a location.  Criminal gang members commonly post photographs and videos to Facebook, Instagram, or other social media apps, showing them associating with other gang members and co-conspirators (sometimes while displaying gang signs, gang-specific pendants, or wearing gang colors), or holding firearms, drugs, and/or gang paraphernalia.  Records of these communications, photographs, and videos may be stored by the social media companies or within the phone itself.

21

45.     When criminal gang members use their phone, location data stored by the device can be used as evidence of their whereabouts at a particular time, which can be used to show someone was in the area of a specific violent crime or show that they were not in the area of a specific crime at a specific point in time. Using historical cell site information and contact list information, investigators will be able to determine instances where King was consulted on matters of QN/QMG importance, and the data may reveal additional facts about crimes committed by QN/QMG generally, including shootings and drug trafficking. Text messages may exist on the phone that show coordination among members in these affairs.

46.     Cellular devices can contain evidence of drug trafficking, such as text messages showing coordination and transportation of narcotics. Photos may exist regarding narcotics sales and distribution witnessed by CD-1 and others, specifically of cash from the May and June 2020 money drops.

47.     Cellular devices can also contain financial information, such as bank account information, receipts, or other electronic cash transfer methods that are used for narcotics sales, which can be used to show cash withdrawals for narcotics purchases or cash deposits from narcotics proceeds. Additionally, financial transactions can be used to identify narcotics transporters and dealers.

48.     Members of criminal enterprises often search the Internet on an electronic device for firearms to purchase for themselves, or by someone with a clean criminal history. Additionally, members of criminal enterprises search the Internet for articles on

22

recent shootings, sometimes to share and taunt rival gang members, or to learn what information law enforcement has shared with the public in identifying suspects.

49.     Drug traffickers, especially King, have been historically known keep notes or ledgers of drug proceeds. Historically, legers have been kept as physical notebooks and journals. As records are now more commonly kept digitally, these ledgers can be found within electronic devices, such as cellphones.

50.     Based on my training and experience, and the FBI investigation involving King and QN/QMG specifically, King is well-known to carry multiple cellular telephones to avoid law enforcement scrutiny, and having multiple cell phones is generally a characteristic indicative of narcotics trafficking activity. Suspects who acquire and sell narcotics often use cell phones to set up and conduct transactions for various illegal drugs. Using cell phones allows drug dealers to easily contact sources of supply and distribute narcotics to drug buyers, the content of which is often recorded in the memory of cell phone and can be contained on cloud-based applications or retained by the provider. Use of multiple cellphones allows users to keep sources of supply and drug customers separate from one another, and inhibits investigative activity such as access to toll records and wiretap warrants by users constantly changing phones and numbers to conduct drug business.

## TECHNICAL TERMS

51.     Based on my training and experience, I use the following technical terms to convey the following meanings:

23

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage

24

media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP

25

addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

52. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, and a GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

53. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

54. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device were used, the purpose of its use, who used it, and when.

26

There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

27

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

55. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

56. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

28

## CONCLUSION

57.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the Devices, there exists fruits or other evidence of a crime involving violations of 18 U.S.C. § 1962, Racketeering Influenced Corrupt Organizations (RICO) Conspiracy, 18 U.S.C. § 1959, Violent Crimes in Aid of Racketeering, 21 U.S.C. § 841(a), Drug Trafficking, 21 U.S.C. 846 Drug Trafficking Conspiracy, and the existence, membership, continuity, racketeering activity, structure, scope, and operations of the QN/QMG criminal enterprise. Accordingly, a search warrant is requested.

58.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

                        Respectfully submitted


                        *S/Nicholas L. Combs*
                        Nicholas L. Combs
                        Task Force Officer
                        Federal Bureau of Investigation



Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit on March 29, 2022.

L. PATRICK AULD
UNITED STATES MAGISTRATE JUDGE

29